## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EDWARD I. SEGEL and IRIS SEGEL, derivatively on behalf of the COLUMBIA ACORN FUND, COLUMBIA ACORN TRUST, and the "COLUMBIA FUNDS"[1] **Plaintiffs** v. FLEETBOSTON FINANCIAL CORPORATION, FLEET NATIONAL BANK, COLUMBIA MANAGEMENT GROUP, INC., COLUMBIA FUND SERVICES, INC., COLUMBIA WANGER ASSET MANAGEMENT, COLUMBIA MANAGEMENT ADVISORS, INC., COLUMBIA FUNDS DISTRIBUTOR, INC., JOHN DOES 1-4, MARGARET EISEN, LEO GUTHART, JEROME KAHN, JR., STEVEN N. KAPLAN, DAVID C. KLEINMAN, ALLAN B. MUCHIN, JOHN A. WING, CHARLES P. MCQUAID, RALPH WANGER, ILYTAT, L.P., RITCHIE CAPITAL MANAGEMENT, INC., EDWARD J. STERN, CANARY CAPITAL PARTNERS LLC, CANARY CAPITAL PARTNERS LTD., CANARY INVESTMENT MANAGEMENT, LLC, DANIEL CALUGAR, SAL GIACALONE, D.R. LOESER, SIGNALERT CORPORATION, ALAN WALDBAUM, and TANDEM FINANCIAL SERVICES **Defendants** and COLUMBIA ACORN FUND, COLUMBIA ACORN TRUST, and the COLUMBIA FUNDS **Nominal defendants** | **CIVIL ACTION** 04 - 10567 MAGISTRATE JUDGE Alexander RECEIPT # 54959 AMOUNT $ 150.00 SUMMONS ISSUED ✓ LOCAL RULE 4.1 ✓ WAIVER FORM _____ MCF ISSUED _____ BY DPTY. CLK. CMG DATE 3-23-04 |

## Derivative Complaint

---

[1] A list of the "Columbia Funds" is attached to this Derivative Complaint ("Complaint") as Exhibit A.

Plaintiffs Edward I. Segel and Iris Segel, derivatively on behalf of the Columbia Acorn Fund, Columbia Acorn Trust, Inc. (the "Trust"), and each of the Columbia Funds hereby complain against the Defendants as follows:

## SUMMARY OF THE ACTION

1.      This derivative action seeks to recover damages to the Columbia Acorn Fund, the Columbia Acorn Trust, Inc., and the Columbia Funds caused by a fraudulent scheme entered into by the defendants to enrich themselves at the expense mutual fund shareholders and the funds by permitting favored investors to engage in rapid in and out trades in the Columbia Funds, a practice commonly called "market timing" or "timing."

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to Section 44 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-43; Section 214 of the Investment Advisors Act of 1940, 15 U.S.C. § 806-14; Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.

3.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as the federal claims alleged.

4.      Venue is proper in this judicial district because some or all of the Defendants conduct business in this district, some of the wrongful acts alleged herein took place or originated in this district. Defendants FleetBoston Financial Corporation, Columbia Management Group, Inc., Columbia Fund Services, Inc., Columbia

Management Advisors, Inc., and Columbia Funds Distributor, Inc. are headquartered in this district.

5.    In connection with the acts and practices alleged herein, Defendants directly or indirectly used the mails and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

## PARTIES

### Plaintiff

6.    Plaintiffs, Edward I. Segel and Iris Segel, residents of Montgomery County, Pennsylvania, purchased shares of the Columbia Acorn Fund beginning in January 2003 and continue to hold such shares.

### Columbia Defendants

7.    Defendant FleetBoston Financial Corporation ("FleetBoston") is a financial services company and the ultimate parent of defendants bearing the Columbia name.  FleetBoston is organized under the laws of Rhode Island and is located at 100 Federal Street, Boston, Massachusetts 02110.

8.    Defendant Fleet National Bank ("Fleet Bank") is a wholly owned subsidiary of Defendant FleetBoston and is the direct parent of Defendant Columbia Management Group.  Fleet Bank is incorporated in Rhode Island and is headquartered at 111 Westminster Street, Providence, Rhode Island 02993.

9.     Defendant Columbia Management Group, Inc. ("CMG") is the asset management arm of FleetBoston, and is among the world's 30 largest asset managers with over $140 billion in assets under management, as of October 31, 2002.  CMG's asset

3

management business is composed primarily of Columbia Management Advisors, Inc. and Columbia Wanger Asset Management. CMG is an Oregon Corporation headquartered at 100 Federal Street, Boston, Massachusetts 02110.

10.    Columbia Fund Services, Inc. ("Columbia Services") is the transfer agent for the Columbia Funds. Columbia Services is responsible for identifying market-timing activity in the funds. Columbia Services is located at 100 Federal Street, Boston, Massachusetts 02110.

11.    Columbia Funds Distributor Inc. ("Columbia Distributor") is the principal underwriter of the Funds' shares. According to the Columbia Funds website Columbia Distributor is a wholly owned subsidiary of FleetBoston and a part of CMG. Columbia Distributor is compensated based on the amount of assets it causes to be invested in the Columbia Funds. Columbia Distributor is located at One Financial Center, Boston, MA 02111-2621.

12.    The Defendants described in paragraphs 7 through 11 are sometimes referred to as the "Columbia Defendants."

**Advisor Defendants**

13.    Defendant Columbia Wanger Asset Management ("WAM") is the advisor to the Columbia Acorn Funds. WAM is a registered investment advisor under the Investment Advisors Act of 1940 and has ultimate responsibility for overseeing the day-to-day operation of the Columbia Acorn Funds. WAM receives advisory fees based on the total assets under management in the funds for which it acts as advisor. WAM is an indirect wholly owned subsidiary of CMG. WAM is headquartered at 227 West Monroe, Suite 3000, Chicago, IL 60606.

4

14.    Columbia Management Advisors Inc. ("Columbia Advisor") is the advisor to all of the Columbia Funds except the Columbia Acorn Funds (the "Non-Acorn Columbia Funds"), which are advised by WAM. Columbia Advisor receives advisory fees based on the total assets under management in the funds for which it acts as advisor. Columbia Advisor is a wholly owned subsidiary of CMG and is located at 100 Federal Street, Boston, Massachusetts 02110.

15.    The defendants described in paragraphs 13 and 14 are sometimes referred to as the "Advisor Defendants."

**John Does 1-4**

16.    John Does 1 through 4 were at relevant times officers and employees of Columbia Distributor and negotiated and/or approved the agreements with the Timer Defendants (see paragraph #) as alleged herein.

17.    Defendant John Doe number 1 was at relevant times the Senior Vice President of Columbia Distributor.

18.    Defendant John Doe number 2 was at relevant times the President of Columbia Distributor.

19.    Defendant John Doe number 3 was at relevant times the National Sales Manager of Columbia Distributor.

20.    Defendant John Doe number 4 was at relevant times the Managing Director for National Accounts of Columbia Distributor.

21.    The Defendants referred to in paragraphs 17 through 20 are sometimes referred to as the "John Doe Defendants."

**Trustee Defendants**

22.     The Trustee Defendants are each members of the Board of Trustees for each of the Acorn Funds. The Trustees have overall management and supervisory responsibility for each of the Acorn Funds and are responsible for protecting the interests of the funds' shareholders. The Trustees also select the officers of the Acorn Funds who are responsible for the day-to-day activities of the funds.

23.     The members of the Board of Trustees, who oversee the Columbia Acorn Funds are:

|       |       |
|-------|-------|
| a.)   | Margaret Eisen |
| b.)   | Leo A. Guthart |
| c.)   | Jerome Kahn, Jr. |
| d.)   | Steven N. Kaplan |
| e.)   | David C. Kleinman |
| f.)   | Allan B. Muchin |
| g.)   | Robert E. Nason |
| h.)   | John A. Wing |
| i.)   | Charles P. McQuaid |
| j.)   | Ralph Wanger |

24.     The defendants described in paragraph 23 are sometimes referred to as the "Acorn Trustees."

**Timer Defendants**

25.    Defendant Ilytat, L.P. is a San Francisco hedge fund that was engaged in market-timing the Columbia Funds at relevant times.    Ilytat L.P. is located at 230 California Street, Suite 700, San Francisco, California, 94111.

26.    Defendant Ritchie Capital Management, Inc. is a hedge fund manager that was engaged in market-timing of the Columbia Funds at relevant times.    Ritchie Capital Management, Inc. is located at 2100 Enterprise Ave, Geneva, Illinois 60134.

27.    Defendant Edward J. Stern is an individual who was engaged in market-timing the Columbia Funds at relevant times through entities he controlled described in paragraph 25 below.    Edward J. Stern is a resident of New York County, New York and at all relevant times was the Managing Principal of CCP, CCP Ltd. and CIM described in paragraph 25 below.

28.    (a)    Defendant Canary Capital Partners, LLC ("CCP"), is a New Jersey limited

liability company with its principal offices in Secaucus, New Jersey.    At relevant times, CCP was a hedge fund engaged in late trading and market-timing mutual funds, including the Columbia Funds.

(b)    Defendant Canary Capital Partners, Ltd. ("CCP Ltd."), is a Bermuda limited liability company.    At relevant times, CCP Ltd. was also a hedge fund engaged in market-timing mutual funds.

(c)    Defendant Canary Investment Management, LLC ("CIM"), is a New Jersey limited liability company with its principal offices in Secaucus, New Jersey.    At all relevant times, CIM managed the assets of CCP and CCP Ltd.    As of July 2003, Canary

Investment Management had received approximately $40 million in Canary management and incentive fees. The size of these fees reflects the phenomenal success Canary enjoyed both in terms of its trading results and the amount of capital it was able to gather in the fund in large part due to the events and circumstances described in this Complaint. CCP, CCP Ltd. and CIM are collectively referred to herein as "Canary" or the "Canary Defendants."

29.    Defendant Daniel Calugar is an individual who was engaged in market-timing the Columbia Funds at relevant times. Calugar is the owner and President of Security Brokerage Inc.. The Securities and Exchange Commission ("SEC") charged Calugar and Security Brokerage in December 2003 with securities fraud involving late trading and market timing in mutual funds in exchange for "sticky asset"[2] investments in the hedge funds of the mutual fund companies, including the Franklin Funds.

30.    Defendant Sal Giacalone is an individual who was engaged in market-timing the Columbia Funds at relevant times. According to an article published on CNNMoney.com on March 2, 2004 Giacalone is a financial consultant at Smith Barney's Waltham, Massachusetts branch.

31.    Defendant D.R.Loeser, a registered investment advisor, was engaged in the business of market-timing the Columbia Funds at relevant times.

---

[2]  Portfolio managers and advisers like WAM and Columbia Adviser make their profit from fees charged to the funds for financial advice and other services. Such fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the advisers and managers make. Knowing this, timers frequently offer the fund advisor static, non-trading assets in exchange for the right to time. These static assets are called "sticky assets."

32.    Defendant Signalert Corporation, a registered investment advisor, was engaged in market-timing the Columbia Funds at relevant times. Signalert Corporation is located at 150 Great Neck Road, Suite 301, Great Neck, New York 11021.

33.    Defendant Alan Waldbaum is an individual who was engaged in the market-timing the Columbia Funds at relevant times.

34.    Defendant Tandem Financial Services, Inc., an investment advisor, was engaged in market-timing the Columbia Funds at relevant times.    Tandem Financial Services, Inc. is located at 6600 Decarie Blvd., Suite 200, Montreal, Quebec H3X 2K4.

35.    The defendants described in paragraphs 25 through 34 are sometimes referred to as the "Timer Defendants."

36.    The defendants described in paragraphs 7 through 34 are sometimes collectively referred to as the "Defendants."

**Nominal Defendants**

37.    Nominal Defendant Columbia Acorn Fund is a mutual fund that invests primarily in common stocks of small and medium-sized companies.  Up to 33% of the fund's assets may be invested in foreign markets.  Columbia Acorn Fund is organized as a series of shares of the Nominal Defendant Columbia Acorn Trust (see paragraph 35) and is advised and managed by Defendant WAM.

38.    Nominal Defendant Columbia Acorn Trust is a Massachusetts Business Trust organized in 1992 as successor to The Acorn Fund, Inc., which became the Columbia Acorn Fund series of the Trust.  Six mutual funds currently comprise the Columbia Acorn Trust: Columbia Acorn Fund, Columbia Acorn International, Columbia Acorn USA, Columbia Acorn Select, Columbia Acorn International Select, and the

Columbia Thermostat Fund. Each Fund is a series of the Trust, and each Fund is an open-end, management investment company. Shares of each Fund and any other series of the Trust that may be in existence from time to time generally vote together except when required by law to vote separately by Fund or by class.

39.    Nominal Defendants the Columbia Funds are mutual funds managed by subsidiaries of FleetBoston and are listed on Exhibit A. As of December 31, 2003, there were 132 Columbia Funds, each one an open-end management investment company.

## FACTUAL BACKGROUND

### Market Timing

40.    Like all other mutual funds, the Columbia Funds' shares are valued once a day, at 4:00 p.m. Eastern Time, following the close of the financial markets in New York. The price, known as the Net Asset Value ("NAV"), reflects the closing prices of the securities that comprise a particular fund's portfolio plus the value of any uninvested cash that the fund manager maintains for the fund. Thus, although the shares of a mutual fund are bought and sold all day long, the price at which the shares trade does not change during the course of the day. Orders placed any time up to 4:00 p.m. are priced at that day's NAV, and orders placed after 4:01 p.m. are priced at the next day's NAV. This practice, to price orders at the next day's NAV, is known as "forward pricing" and has been required by law since 1968.

41.    Late Trading. Because of forward pricing, mutual funds are susceptible to a manipulative practice known as "late trading." Late trading is the unlawful practice of allowing some investors to purchase mutual fund shares **after** 4:00 p.m. at that day's NAV, even though such after-hours trades should be priced at the next day's NAV. Late

traders seek to take advantage of events that occur after the close of trading on any given day, while purchasing shares of mutual funds at prices that do not reflect those events. "Late trading can be analogized to betting today on yesterday's horse races."[3]  The late trader's arbitrage profit comes dollar-for-dollar out of the mutual fund that the late trader buys. W hen t he l ate t rader r edeems h is s hares a nd c laims h is p rofit, *t he m utual f und manager has to either sell stock, or use cash on hand -- stock and cash that used to belong in the shareholder and the fund* -- to give the late trader his gain. The late trader's profit is revenue withheld from the shareholders and the mutual fund. The forward pricing rule was enacted precisely to prevent this kind of abuse. *See* 17 C.F.R. §270.22c-1(a).

42.    Timing.    Another manipulative practice used by Defendants to exploit mutual fund pricing is known as "timing," which involves short-term "in-and-out" trading of mutual fund shares. One timing scheme is *"time zone arbitrage,"* which takes advantage of the fact that some funds use "stale" prices to calculate NAV. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that invests in Japanese companies. Because of the time zone difference, the Japanese market closes at 2:00 a.m. New York time. When the NAV is calculated at 4:00 p.m. in New York, it is based upon market information that is fourteen hours old.   If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it opens later, the stale Japanese prices will not reflect the price change and the fund's NAV will be artificially low. A trader who buys the Japanese fund at the "stale"

---

[3]  *State of New York v. Canary Capital Partners et al.*, Supr. Ct. of N.Y., ¶ 10 ("NYAG Complaint").

price is virtually assured of a profit that can be realized the next day by selling. By "timing" the fund, an investor seeks to earn repeated profits in a single mutual fund.

43.   Another market timing scheme is *"liquidity arbitrage."*   Under this scheme, a trader seeks to take advantage of stale prices in certain infrequently traded investments, such as high-yield bonds or the stock of small capitalization companies. The fact that such securities may not have traded for hours before the 4:00 p.m. closing time can render the fund's NAV stale, and thus open it to being timed.

44.   The device of market timing is inconsistent with and inimical to the purpose for mutual funds as long-term investments. Mutual funds are designed for buy-and-hold investors, and are therefore the preferred investment instruments for many retirement and savings accounts. Nonetheless, certain investors attempt to make quick in-and-out trades in order to exploit the inefficiency of mutual fund pricing. The effect of market timing is to artificially increase the frequency of transactions in a mutual fund, and consequently *increase the fund's transaction costs* substantially above what would be incurred if only buy-and-hold investors were trading in the fund's shares. *The increased transaction costs, as well as additional capital gains taxes, reduces the assets of the fund and in turn its NAV.*

45.   Market timing also disrupts the trading program of the funds' managers forcing ill-timed redemption and depleting cash in the fund.

46.   Continued *successful* timing requires the complicity of a funds' management, which the Timer Defendants received.

47.   Timers also frequently pursue a strategy of trading through third parties, *i.e.*, brokers or other intermediaries who process large numbers of mutual fund trades

12

every day through omnibus accounts where trades are submitted to mutual fund companies en masse. This way, timers hope their activity will be lost amid the other trades in the omnibus account. This is called "*timing under the radar*."

48.     Because of the harm timing can cause, honest fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. However, such efforts by honest fund managers to counter the ill effects of market timing on their funds does not eliminate the harm, it only reduces it. Indeed, one recent study estimated that U.S. mutual funds lose $4 billion per year to timers. See Eric Zitzewitz, Who Cares About Shareholders? Arbitrage-Proofing Mutual Funds (October 2002) 35,

http://faculty-gsb.stanford.edu/zitzewitz/Reseach/arbitrage1002.pdf.

49.     Insider Timing. "Timing" is not a quick-buck device limited to third parties like Calugar who act either alone or in complicity with fund managers. Fund insiders, like portfolio managers, are sometimes unable to resist the opportunity for quick profits at the expense of the funds offered by timing opportunities. At least one Columbia Fund manager succumbed to this temptation and timed his or her own 401(k) retirement accounts, according to a FleetBoston's web site.

## SUBSTANTIVE ALLEGATIONS

## PROSPECTUS DISCLOSURES

50.     The Columbia Funds, like most mutual funds, have internal policies concerning market timing.

51.     For example, the prospectuses filed February 26, 1999 for each of the funds within the Columbia Acorn Trust state, in relevant part:

13

> THE ACORN FUNDS DO NOT PERMIT MARKET-TIMING and have
> adopted policies to discourage this practice.
>
> Generally, you will be permitted to make up to 4 round trip exchanges per year
> (a round trip is an exchange out of one fund into another fund, and then back
> again).
>
> YOU MAY ONLY EXCHANGE BETWEEN ACCOUNTS THAT
> ARE REGISTERED IN THE SAME NAME, ADDRESS, AND
> TAXPAYER IDENTIFICATION NUMBER.
> …
> Acorn may temporarily or permanently terminate the exchange plan privilege of
> any investor who makes excessive use of the plan.  Excessive trading can hurt
> fund performance and shareholders.
>
> Acorn may refuse exchange purchases by any person or group, if Acorn
> believes the purchase will be harmful to existing shareholders.

(emphasis in original).

52.    Later prospectuses for the each of the funds within the Columbia Acorn

Trust (Funds) filed with the SEC on April 30, 2003 state:

> **The Fund does not permit short-term or excessive trading in its
> shares**.  Excessive purchases, redemptions or exchanges of Fund shares
> disrupt portfolio management and increase Fund expenses.  In order to
> promote the best interests of shareholders, **the Fund (and any other
> funds distributed by Liberty Funds Distributor, Inc.) reserves the
> right to reject any purchase order or exchange request, particularly
> from market timers or investors who, in the adviser's opinion, have a
> pattern of short-term or excessive trading or whose trading has been
> or may be disruptive.**

(emphasis added).

53.    The prospectuses for the Columbia Acorn International and Columbia

Acorn Foreign Forty Funds, both series of shares within the Columbia Acorn Trust, in

addition to the disclosure quoted in paragraph 47, state:

> **In addition, if you redeem or exchange shares of the Fund that you
> have owned 60 days or less, the Fund will charge you a redemption fee**

14

**of 2% of the redemption proceeds.** The Fund will use the "first-in" "first-out" method to determine when shares were purchased. Shares purchased prior to February 10, 2003 will not be subject to the redemption fee. **The redemption fee will be deducted from your redemption proceeds and retained by the Fund to help cover transaction and tax costs that long-term investors may bear when the Fund realizes capital gains as a result of selling securities to meet investor redemptions.** The redemption fee is not imposed on redemptions or shares purchased through reinvestment of dividends and distributions, or exchanges of shares for Class Z shares of a fund distributed by Liberty Funds Distributor, Inc. that has a redemption fee. The Fund may waive the 2% redemption fee for 401(k) plans that are in the process of liquidating their Fund investments.

(emphasis added).

54.    Contrary to these stated policies the Columbia Defendants and the John Doe Defendants knowingly permitted and actively facilitated the Timer Defendants' market timing to the detriment of the Columbia Funds and their shareholders.

55.    The Timer Defendants perpetrated this manipulative scheme on the Columbia Funds, from at least 1998 to 2003, directly or with the complicity of the Columbia Defendants and the John Doe Defendants. The schemes violated the said defendants' fiduciary duties to the Columbia Funds and the securities laws, but gained the defendants substantial fees and other income for themselves and their affiliates.

56.    On January 15, 2004 FleetBoston issued a press release reporting that Columbia Management Advisors, Inc. and Columbia Funds Distributor, Inc. had received "Wells" notices from the Securities and Exchange Commission ("SEC") indicating that the SEC intended to commence an enforcement action relating to improper market timing in Columbia Funds. The press release stated, in relevant part:

In a separate development, FleetBoston said that earlier this month two of its subsidiaries, **Columbia Management Advisors, Inc., and Columbia Funds Distributor, Inc., received "Wells" notices stating that the SEC Regional Office staff in Boston had made a preliminary determination**

to recommend that enforcement action be brought against them, alleging that certain fund prospectuses did not accurately disclose, in violation of fiduciary duties, certain trading activity in fund shares. We believe that the allegations relate to a limited number of trading arrangements occurring in the period 1998-2003. The majority of trades made pursuant to these arrangements were made by three entities and occurred in one international and two domestic funds. None of these arrangements is in existence today. The subsidiaries intend to engage in discussions with the SEC in an effort to reach a satisfactory resolution of these matters.

(emphasis added).

## AGREEMENTS WITH MARKET-TIMERS

57.    Beginning in 1998 and continuing through 2003, Columbia Distributor entered into at least nine arrangements with investment advisors, hedge funds, brokers and individuals allowing them to market-time various Columbia Funds in exchange for "sticky asset" investments in other investment vehicles of Columbia affiliates.

### Ilytat, L.P.

58.    Between April 2000 and October 2002 Defendant Ilytat, L.P. ("Ilytat") made nearly 350 round trip trades in seven International Columbia Funds. A significant number of these trades were made pursuant to an agreement Ilytat made with Columbia Distributor, with the approval of Columbia Advisor and the Portfolio Manager of the Newport Tiger Fund, to market time the Newport Tiger Fund.

59.    Under the agreement, Ilytat a greed to place $20 million in the Newport Tiger Fund, with two-thirds of that amount remaining static and one third to be actively traded in and out.

60.    In 2000, Ilytat made $133 million in purchases or exchanges and redeemed $104 million in the Newport Tiger Fund. During the first 5 months of 2001,

Ilytat's purchases in the Newport Tiger Fund accounted for $72 million of the total purchases of $204 million in that fund.

61.    Defendant John Doe 2 (President of Columbia Distributor), knew about Ilytat's market timing in the Newport Tiger Fund, but allowed it to continue. The Portfolio Manager for the Newport Tiger Fund repeatedly wrote to John Doe 2 expressing concern about the harm that Ilytat's activity was having on the fund and its investors. Despite the manager's efforts, by June 2000 Ilytat was making weekly round trips of $7 million.

62.    Ilytat made 73 round trips in the Columbia Acorn International Fund between September 1998 and October 2003. At the peak of its market timing in the Acorn International Funds, Ilytat made at least 40 round trips in the fund

**Ritchie Capital Management, Inc.**

63.    Between January 2000 and September 2002 Defendant Ritchie Capital Management, Inc. ("Ritchie") made over 250 round trips in the Newport Tiger Fund.

64.    In 2001 Columbia Distributor negotiated with Ritchie to allow 12 round trips in the Newport Tiger Fund. At the end of 2001, Defendant John Doe 1, the Senior Vice President of Columbia Distributor, met with and sought from Ritchie principals a "sticky asset" investment in a fixed income fund in exchange for continued timing of the Newport Tiger Fund. At the time, Ritchie's $52 million investment in the Newport Tiger Fund constituted nearly 10% of that fund's $525 million in assets.

65.    In 2002, Columbia Distributor, with the assistance and consent of the Portfolio Manager for the Columbia Growth Stock Fund, agreed to permit Ritchie to market-time 10% of a $200 million investment in that fund with no limit on the number

of round trips. Ritchie made at least five round trips within two months in amounts up to $7 million.

66.    In 2003, Ritchie made another agreement, with the permission of both Defendant John Doe 1, the President of Columbia Distributor, and the Portfolio Manager of the Growth Stock Fund, in which he would place $20 million in the Growth Stock Fund, make unlimited round trips with up to $2 million, and place another $10 million in the Columbia Short Term Bond Fund as a sticky asset.

67.    Between June 2002 and September 2003, Ritchie made approximately 18 round trips in the Growth Stock Fund.

**Edward J. Stern**

68.    During late 2002 and early 2003, Defendant Edward J. Stern ("Stern") negotiated with Columbia Distributor through two intermediaries to market time the Columbia Growth & Income Fund, Columbia Select value Fund, and the Growth Stock Fund.    In early 2003, Epic Advisors, on behalf of Stern's Canary Investment Management firm, entered an agreement with Columbia Distributor, with the approval of Defendant John Doe 3, Columbia Distributor's National Sales Manager, permitting Stern to make up to 3 round trips per month using his entire investment of $37 million in those three funds.

69.    During the same time period, Stern also placed $5 million in the Columbia High Yield Fund with permission to make one round trip per month from Columbia Distributor and with the approval of the Portfolio Manager for that fund.    Between November 2002 and July 2003 Stern made seven round trips in that fund averaging $2.5 million each time.

**Daniel Calugar**

70.    Beginning about April 1999, Defendant Daniel Calugar ("Calugar") reached an agreement with Columbia Distributor allowing him to make one round trip per month using up to $50 million in either the Growth Stock Fund or the Columbia Young Investor Fund, which was a fund targeting children with a goal toward educating young investors. Defendants Joe Doe 4 (the Managing Director of National Accounts for Columbia Distributor), and John Doe 1 (Senior Vice President of Columbia Distributor), as well as the Portfolio Manager for the Growth Stock Fund, approved the arrangement.

71.    In fact, Calugar averaged more than one round trip per day in the Columbia Funds. Calugar made over 200 round trips in the Young Investor Fund in 2000 trading up to $2.3 million at a time. He also made at least 13 round trips in the Stein Roe International Fund.

72.    Calugar made nearly 70 round trips in the Growth Stock Fund of up to $4 million at a time between January 2000 and February 2001. He also made approximately 20 round trips in the Newport International Equity Fund during 2000 in amounts up to $6.6 million.

**Sal Giacalone**

73.    Defendant Sal Giacalone ("Giacalone") entered an agreement with Columbia Distributor, with the approval of its President, Defendant John Doe 2, to place $5 million in sticky assets in the Columbia Acorn Funds in exchange for the right to make up to four round trips per month up to $15 million each in the Newport Tiger Fund.

19

74.    Giacalone made 43 round trips in the Newport Tiger Fund between November 2000 and April 2001.

**D.R. Loeser**

75.    Defendant D.R Loeser ("Loeser") entered an agreement with Columbia Distributor, which was approved by Defendant John Doe 1 (Columbia Distributor's Senior Vice President), the Portfolio Manager of the Growth Stock Fund, and the President of the Stein-Roe fund complex, allowing Loeser to make five $8 million round trips per month in the Growth Stock Fund.

76.    Between January and May 2000 Loeser made approximately 20 round trips in the Growth Stock Fund and 20 round trips in the Young Investor Fund.

**Signalert Corporation**

77.    Defendant Signalert Corporation ("Signalert") entered an agreement with Columbia Distributor in 1999 that  allowed Singalert to make 10 round trips annually up to $7.5 million in both the Growth Stock Fund and the Young Investor Fund.   In exchange, Signalert was to place $5 million in each of six other funds trading only once a quarter.

78.    In late 1999 senior management of Columbia Distributor pushed to increase the size of Signalert's investments.  Signalert agreed to place additional sticky assets in a money market fund in exchange for permission to make 12 round trips per year in the Growth Stock Fund and Young Investor Fund.  The Growth Stock Fund Portfolio Manager and the Young Investor Portfolio Manager both approved the agreement.